IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROBERT HOWARD GASTON,               )   Civil No.3:11-cv-00339-JE
                                    )
                    Plaintiff,      )
                                    )   OPINION AND ORDER
            v.                      )
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
                    Defendant.      )
_____)

        Tim D. Wilborn
        Wilborn Law Office, P.C.
        P.O. Box 2768
        Oregon City, OR 97045

            Attorney for Plaintiff


        S. Amanda Marshall, U.S. Attorney
        Adrian L. Brown, Asst. U.S. Attorney
        1000 S.W. 3rd Avenue, Suite 600
        Portland, OR 97204-2902

OPINION AND ORDER - 1

Benjamin Groebner
Social Security Administration
Office of the General Counsel
701 Fifth Avenue, Suite 2900, M/S 221A
Seattle, WA 98104

       Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff Robert Gaston brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. §§ 401-34 and 1381-1383f.

For the reasons set out below, the Commissioner's decision is affirmed.

### Procedural Background

Plaintiff filed applications for DIB and SSI on March 8, 2007, alleging that he had been disabled since July 18, 2005, because of right shoulder impairment post-surgery, right knee impairment post-surgery and right knee osteoarthritis, and bilateral degenerative joint disease of the knees and shoulders. After his applications had been denied initially and upon reconsideration, Plaintiff timely requested a hearing before an Administrative Law Judge (ALJ).

A hearing was held before ALJ Donna Montano on July 9, 2009. In a decision filed on September 30, 2009, ALJ Montano found that Plaintiff was not disabled within the meaning of the Social Security Act (the Act). That decision became the final decision of the Commissioner on January 26, 2011, when the Appeals Council denied Plaintiff's request for review. In the present action, Plaintiff seeks review of that decision.

**Background**

Plaintiff was born on July 25, 1960, and was 49 years old at the time of the ALJ's

decision denying his applications for benefits.  He obtained a GED, and has past relevant work

as an electrician and a truck driver.

**Disability Analysis**

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is

disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary

of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir.

1999).

Step One.  The Commissioner determines whether the claimant is engaged in substantial

gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is

not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's

case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe

impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant

has a severe impairment, the Commissioner proceeds to evaluate the claimant's case under Step

Three.  20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the

Commissioner next determines whether the claimant's impairment "meets or equals" one of the

presumptively disabling impairments listed in the Social Security Administration (SSA)

regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment

is disabled.  If the claimant's impairment does not meet or equal an impairment listed in the

OPINION AND ORDER - 3

regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four. 20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform relevant  work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  Id.

**Medical Record**

Dr. Mark Berkson examined Plaintiff on May 23, 2006.  He noted that Plaintiff had a history of injuries to both knees, and a history of instability in his right knee, which had been

OPINION AND ORDER - 4

surgically repaired several times. An x-ray of Plaintiff's right knee taken that day showed mild tri-compartmental degenerative joint disease and status-post anterior cruciate ligament (ACL) reconstruction. Dr. Berkson noted that Plaintiff had difficulty stepping up on a stool with his right knee, had decreased sensation across the medial and lateral aspects of the right knee, and decreased range of motion with patellofemoral crepitus. Plaintiff reported mild pain with right knee range of motion. Dr. Berkson noted medial joint line tenderness and anterior instability with the Lachman maneuver as well as medial joint instability with valgus stress. He noted that Plaintiff was apprehensive about the pivot test.

Dr. Berkson diagnosed right knee degenerative joint disease with instability, status-post ACL reconstruction. He opined that Plaintiff's injury was consistent with an ACL tear that had gone untreated, and thought that it was related to an injury Plaintiff had suffered while he was in the military. Dr. Berkson opined that Plaintiff would likely experience additional episodes of instability, loss of endurance, pain, and loss of range of motion with repetitive activity.

An x-ray of Plaintiff's left knee taken on March 15, 2007, showed a slight deformity of the medial tibial plateau, which was thought to be the related to an earlier injury. No significant degenerative changes were noted. An x-ray of Plaintiff's left shoulder taken the same day showed mild to moderate degenerative changes in the glenohumeral joint and calcification adjacent to the humeral head which was consistent with calcific peritendinities. Minimal degenerative changes were noted at the acromioclavicular joint.

Dr. Jon McKellar examined Plaintiff on March 3, 2008. He noted Plaintiff's history of right knee and right shoulder surgeries. Plaintiff reported that his wheezing had improved since he quit smoking. Dr. McKellar found some decrease in range of motion in Plaintiff's left shoulder and neck, and noted that Plaintiff reported pain in those areas. He noted tenderness

OPINION AND ORDER - 5

over the long head of the biceps and over the posterior capsule of the right shoulder, and tenderness over the long head of the biceps in the left shoulder. Dr. McKellar found mildly decreased strength in Plaintiff's quadriceps and knee flexor muscles bilaterally, and opined that Plaintiff had status-post right shoulder injury and status-post right knee injury with mild to moderate osteoarthitis and ligament instability with chronic pain. Plaintiff had normal strength and range of motion in his right shoulder.

Dr. McKellar opined that Plaintiff could "stand, walk, and sit for a reasonable amount of time as long as it's on even ground and he is not required to walk up and down stairs." He added that Plaintiff "would do fine in an office walking for a normal length of time but . . . he would be at risk at a construction site." Dr. McKellar thought that Plaintiff could lift and carry 20 pounds frequently and could lift and carry 30 pounds occasionally.

Dr. Karl Knudsen examined Plaintiff on April 29, 2009. Dr. Knudsen reported that Plaintiff's gait was normal, but that he had difficulty stepping up with his right knee. He noted laxity in that knee with drawer testing and laxity in the left knee with anterior drawer testing. Plaintiff had full motion with each knee. Dr. Knudsen found that Plaintiff had mild arthritis in his left knee, and noted that the left knee was tender to palpation. He found that Plaintiff had reduced range of motion in his right shoulder and severe pain with apprehension testing. X-rays showed that a surgical screw in Plaintiff's right shoulder had "backed out" of the anterior glenoid, and showed arthrosis of the acromioclavicular joint. Dr. Knudsen recommended that an MRI be taken of Plaintiff's left knee and right shoulder, and that hardware be surgically removed from his right shoulder.

**Hearing Testimony and Lay Witness Evidence**

OPINION AND ORDER - 6

**Plaintiff**

Plaintiff testified as follows at the hearing before the ALJ.

Plaintiff had recently learned that a surgical screw placed in his right shoulder during a previous surgery had shifted out of place. He could not afford surgery to remove the damaged hardware, and did not have medical insurance to obtain the treatment he needed. Plaintiff also needed surgery on his left shoulder. He could not reach overhead  His knees were weak and tended to give out, so he needed to avoid making quick movements. Plaintiff's right knee had been operated on five times. He had a 40% Veterans Administration (VA) disability rating–30% for his right knee and 10% for his left shoulder–and received VA disability payments of $540 per month.

Plaintiff took over the counter pain medications. He did not take prescription pain medications because he did not like the side effects of narcotics, and feared these medications because they had "ended up killing" his paralyzed brother.

Plaintiff had mild emphysema, which had not been treated because Plaintiff lacked insurance and funds. He also had swelling in his hands and fingers, and had difficulty gripping objects. Plaintiff thought he had carpal tunnel syndrome in his hands, but could not afford to have them tested; he was not sure that the VA would address problems with his hands, because they were not service related. Problems with his hands made it difficult for Plaintiff to perform tasks such as using a screwdriver or moving firewood. His hands swelled and "locked," and his fingers became numb if he used them too much.

Plaintiff's knee problems made stair climbing difficult and slow; he had to turn sideways and take one stair at a time. Plaintiff's shoulder pain was "like a constant headache." He could sit for about 15 to 20 minutes before needing to change positions, and could stand for 5 to 10

OPINION AND ORDER - 7

minutes at a time.  Plaintiff needed to lie down frequently to relieve pain.  He had undergone

surgery to repair a hernia, and avoided heavy lifting so that he would not re-injure the affected

area.  Plaintiff avoided concrete floors because they caused knee pain and instability.  He could

only shop in large stores like Wal-Mart for approximately 10 minutes before he needed to leave.

**Vocational Expert**

The ALJ posed a vocational hypothetical describing an individual who could perform

light work, was limited to occasional climbing, kneeling, crouching, and crawling, was limited to

occasional bilateral overhead reaching, and needed to work on even ground.  The VE testified

that an individual with these limitations could not perform Plaintiff's past relevant work, but

could work as a loss prevention surveillance monitor or a blood donor unit assistant.

In response to questioning by Plaintiff's former attorney, the VE testified that an

individual with these limitations who also could sit for only 30 minutes at a time, could

stand/walk for 10 minutes at a time, and needed to alternate these with reclining for 5 to 10

minutes at a time could not maintain competitive employment.  The VE testified that a limitation

to sitting for 30 minutes and standing/walking for 10 minutes would erode the employment base

considerably, and that employers would not likely employ an individual who needed extra breaks

throughout the day.

### ALJ's Decision

At the first step of her disability analysis, the ALJ found that Plaintiff had not engaged in

substantial gainful activity since July 18, 2005, the date of the alleged onset of his disability.

At the second step, the ALJ found that Plaintiff's status post-right shoulder injury with

OPINION AND ORDER - 8

residual discomfort and status post-injury to right knee with mild to moderate osteoarthritis were severe impairments within the meaning of 20 C.F.R. § 416.920(c).

At the third step, the ALJ found that, alone or in combination, Plaintiff's impairments did not meet or equal a presumptively disabling impairment set out in the "listings," 20 C.F.R. Part 404, Subpart P, Appendix 1.

Before proceeding to the fourth step, the ALJ assessed Plaintiff's residual functional capacity (RFC). She found that Plaintiff retained the capacity to do light exertional level work, limited to occasional climbing, kneeling, crouching, crawling, and bilateral overhead reaching, performed in an environment with even ground. The ALJ found that Plaintiff's descriptions of his limitations and impairments were not credible to the extent they were inconsistent with this assessment.

At the fourth step of his disability assessment, the ALJ found that Plaintiff could not perform his past relevant work as an electrician or truck driver.

Based upon the testimony of the VE, at the fifth step the ALJ found that Plaintiff could perform "other work" that existed in substantial numbers in the national economy. She cited blood donor unit assistant and loss prevention surveillance monitor positions as examples of such work. Based upon this conclusion, the ALJ found that Plaintiff was not disabled within the meaning of the Act.

### Standard of Review

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Claimants bear the initial burden of establishing disability. Roberts v. Shalala,

66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  The Commissioner bears

the burden of developing the record,  DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991),

and bears the burden of establishing that a claimant can perform "other work" at Step Five of the

disability analysis process.  Tackett, 180 F.3d at 1098.

The district court must affirm the Commissioner's decision if it is based on proper legal

standards and the findings are supported by substantial evidence in the record as a whole.

42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Andrews, 53 F.3d at 1039.  The court must weigh all of the evidence, whether it supports or

detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir.

1986).  The Commissioner's decision must be upheld, however, even if "the evidence is

susceptible to more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.

### Discussion

Plaintiff contends that the ALJ erred in concluding that his knee impairments do not meet

or equal Listing 1.02A (Major dysfunction of a joint); finding that his description of his

symptoms and impairments was not wholly credible; and concluding at step five of the disability

analysis that he could perform "other work" that exists in substantial numbers in the national

economy.

1. **Determination that Plaintiff's knee impairments did not meet or equal a listed
impairment**

OPINION AND ORDER - 10

Plaintiff contends that his knee impairments meet, or at least equal, Listing 1.02A, 20

C.F.R. § 404, Subpart P, Appendix 1, Listing 1.02A.  That listing, which applies to "major

dysfunction of a joint(s) (due to any cause)," defines a qualifying joint impairment as one:

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joints(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b

20 C.F.R. § 404, Subpart P, Appendix 1, Listing 1.02A.

The inability to ambulate effectively is defined as

> an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities . . . .

The ability to ambulate effectively is defined as the ability to sustain

> a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living, employment or school.  Therefore, examples of ineffective ambulation include . . . inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. § 404, Subpart P, Appendix 1, Listing 1.00B2b

A careful reading of the medical record, the relevant regulations, and the decision

denying his applications for benefits supports the conclusion that the ALJ did not err in

OPINION AND ORDER - 11

concluding that Plaintiff's knee impairments do not meet or equal Listing 1.02A. That Listing is

satisfied only if a joint such as a knee has a "gross anatomical deformity" (such as instability)

and "chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion

of the affected joint(s) and" there are findings based upon appropriate "imaging of joint space

narrowing, bony destruction, or ankylosis" that results in "an inability to ambulate effectively."

The first of these requirements is satisfied here, because the medical record includes evidence of

instability in Plaintiff's right knee. However, the requirement that this anatomical deformity be

accompanied by a limitation of motion or other abnormal motion is not. Plaintiff's contention

that instability constitutes "abnormal motion" is not persuasive, and is not supported by evidence

in the medical record. Repeated testing showed that Plaintiff had full range of motion in his

knees, and no medical source indicated that Plaintiff had "abnormal" motion in those joints. The

inclusion of "instability" in the regulatory definition of anatomical deformities indicates that

instability is considered a type of deformity rather than a type of motion. In addition, the

medical record does not show findings, based upon imaging, of joint space narrowing, bony

destruction, or ankylosis in either knee.

Even if these requirements were satisfied (and they are not), Plaintiff has not shown that

problems with his knees result in an "inability to ambulate effectively" within the meaning of the

relevant regulations, which require a showing of "an extreme limitation in the ability to walk."

The record does not establish that Plaintiff has such an extreme limitation, defined as one that

"interferes very seriously with the individual's ability to independently initiate, sustain, or

complete activities." Dr. McKellar opined that Plaintiff could walk for a reasonable amount of

time if he were on even ground and did not have to walk up and down stairs, and would "do

fine" walking in an office. Plaintiff contends that Dr. McKellar's reference to even surfaces and

the ALJ's restriction to work on such surfaces and exclusion of stair climbing establishes that he

cannot ambulate effectively because the inability to walk a block at a reasonable pace on rough

surfaces and to climb a few stairs at a reasonable pace using a single handrail are specified

examples of ineffective ambulation.  I disagree.  The record includes no medical finding that

Plaintiff could not walk one block at a reasonable pace over rough or uneven surfaces.  Dr.

McKellar's opinion that Plaintiff could not <u>work</u> on such surfaces and the ALJ's restriction to

work on even surfaces that did not require stair climbing are not inconsistent with the conclusion

that Plaintiff could ambulate effectively as that term is defined in the regulations.  The ALJ

reasonably concluded that Plaintiff's knee problems did not meet a listed impairment, and that

conclusion  was supported by substantial evidence.

      Plaintiff contends that, if  his knee impairments do not meet a listed impairment, they at

least <u>equal</u> an impairment in the listings.  He cites  <u>Marcia v. Sullivan</u>, 900 F.2d 172 (9th Cir.

1990) , in support of his assertion that the ALJ did not properly address this issue.  There, the

court observed  that "in determining whether a claimant equals a listing under step three of

the . . . disability evaluation process, the ALJ must explain adequately his evaluation of

alternative tests and the combined effects of the impairments."  <u>Id.</u> at 176.  However, in that

action the claimant had  "presented evidence in an effort to establish equivalence," including an

alternative test to establish the existence of a finding that was required to meet the relevant

listing.  <u>Id.</u>  Where a claimant has not presented  the ALJ a plausible theory of how an

impairment equals a listing, the ALJ is not required to provide an extensive discussion of the

equivalency analysis.  <u>See</u> <u>Lewis v. Apfel</u>, 236 F.3d 503, 514 (9th Cir. 2001);  <u>Gonzalez v.

Sullivan</u>, 911 F.2d 1197, 1200-01 (9th Cir. 1990) (ALJ not required to include extensive analysis

of listings where ALJ's thorough evaluation of evidence adequately supported his conclusions).

Here, Plaintiff did not present evidence of equivalence to the ALJ, and the ALJ

thoroughly discussed and evaluated the relevant medical evidence.  The ALJ's evaluation fully

supported the conclusion that Plaintiff did not have an impairment or combination of

impairments that met or equaled a listed impairment.  Under these circumstances, the brevity of

the ALJ's analysis of the issue of equivalence does not provide a basis for reversing the

underlying decision.

2. **ALJ's Assessment of Plaintiff's Credibility**

Plaintiff contends that the ALJ erred in concluding that he was not credible to the extent

that his description of his impairments and symptoms was inconsistent with her assessment of

his RFC.

The ALJ is responsible for determining credibility, resolving conflicts in medical

testimony, and resolving ambiguities.  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  If

a claimant produces medical evidence of an underlying impairment that is reasonably expected

to produce some degree of the symptoms alleged, and there is no affirmative evidence of

malingering, an ALJ must provide "clear and convincing reasons" for an adverse credibility

determination.  Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996); Gregor v. Barnhart, 464

F.3d 968, 972 (9th Cir. 2006).  If substantial evidence supports the ALJ's credibility

determination, that determination must be upheld, even if some of the reasons cited by the ALJ

are not correct.  Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1162 (9th Cir.

2008).

An ALJ must examine the entire record and consider several factors, including the

claimant's daily activities, medications taken and their effectiveness, treatment other than

medication, measures other than treatment used to relieve pain or other symptoms, and "any

other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms."  SSR 96-7.

Here,  Plaintiff produced evidence of underlying impairments that could be reasonably expected to cause some degree of the symptoms alleged and there was no evidence of malingering.  Therefore, the ALJ was required to provide clear and convincing reasons for concluding that he was not wholly credible.

The ALJ found that Plaintiff's description of his symptoms and limitations was not wholly credible because his allegations of disabling levels of pain were not supported by the objective medical evidence, the course of medical treatment he followed and the medications he used were not consistent with the disabling levels of pain he alleged, the reasons he gave for not seeking certain medical services were not reasonable, and his activities were inconsistent with the degree of pain and impairment he alleged.

These are clear and convincing reasons, supported by the record,  for finding that Plaintiff was not wholly credible.  Certainly, a claimant's subjective pain testimony cannot be rejected solely on the grounds that it is not fully corroborated by objective medical evidence. E.g., Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).  However, medical evidence is a relevant factor in evaluating the severity and effects of a claimant's pain. Id.; 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).  Here, the ALJ cited substantial objective medical evidence which she found was inconsistent with the degree of impairment that Plaintiff alleged.  She cited evaluations showing that Plaintiff walked with a normal gait, x-rays that showed only mild to moderate degenerative changes, and an examining physician's opinion that his condition did not preclude employment that did not involve manual labor.

OPINION AND ORDER - 15

The treatment a claimant uses to alleviate pain is a relevant factor in evaluating the
intensity and persistence of symptoms, 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  Therefore,
the treatment and medications a claimant uses to relieve pain is relevant in assessing credibility,
Burch v. Commissioner, 400 F.3d 676, 681 (9th Cir. 2005), and an ALJ may consider reliance on
over-the-counter medication in evaluating a claimant's allegations concerning the severity of an
impairment.  Parra v. Astrue, 481 F.3d 742, 750-51 (9th Cir. 2007); Johnson v. Shalala, 60 F.3d
1428, 1434 (9th Cir. 1995).  Plaintiff's reliance on over-the -counter pain medications was a
legitimate consideration in evaluating his credibility.  The ALJ reasonably concluded that
Plaintiff's reliance on these medications alone was inconsistent with his allegations of disabling
levels of pain.  She noted that Plaintiff testified that he did not take prescription pain medications
in part because his brother's addiction to such medications had proved fatal, and reasonably
rejected that as a legitimate basis for avoiding stronger medications in light of Plaintiff's
testimony that he experienced "constant disabling pain."  As part of her credibility
determination, the ALJ also noted that Plaintiff had "not pursued any formal course of treatment
for his allegedly disabling impairments."  This observation was supported by Plaintiff's
testimony that he had not sought treatment for carpal tunnel problems because he was not sure
whether the VA would provide treatment, as that impairment was not service-related.  Plaintiff's
failure to even inquire as to whether the VA might assess and treat that impairment, and his
failure to follow up the VA's evaluations of other problems and to adequately explain why he
did not do so supports the ALJ's credibility determination.

The ALJ's conclusion that Plaintiff's daily activities were inconsistent with his
allegations of disabling pain provided additional support for her credibility determination.  The
ALJ noted that Plaintiff helped his girlfriend perform some of her job duties, did household

chores, helped feed his handicapped brother, did his own shopping, and attended construction

management classes.  Her conclusion that these activities were not consistent with Plaintiff's

testimony concerning the intensity and persistence of his symptoms was reasonable.

Plaintiff contends that the ALJ's credibility determination is flawed because the record

includes, and the ALJ cited, no evidence contradicting his assertion that he cannot sit, stand, and

walk for a total of 8 hours, as is required to work full-time.  This argument is not supported by

the record: Drs. Berkson, McKeller, and Berner all opined that Plaintiff retained the functional

capacity required for full-time work.  Dr. Berkson opined that Plaintiff's right knee did not "limit

his ability to be employed in work that does not involve manual labor," and Dr. McKellar opined

that Plaintiff could work in an office environment.  Dr. Berner opined that Plaintiff could

consistently perform light work.  The ALJ cited these opinions in her review of the medical

record.

3. **ALJ's Finding that Plaintiff Could Perform "Other Work"**

Plaintiff contends that the ALJ's conclusion that he could perform "other work" at step

five of the disability analysis was flawed because it was based upon a vocational hypothetical

that did not include all of his limitations and restrictions.  He argues that the  ALJ erred in

concluding that he could work as a blood donor assistant because that position required an ability

to reach that exceeded his RFC, and contends that the ability to work as a surveillance system

monitor might not demonstrate the ability to perform "other work" because that position "may

not exist in significant numbers in the national or local economy."

In order to be accurate, an ALJ's vocational hypothetical to a VE must set out all of the

claimant's impairments and limitations.  E.g., Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir.

1984).  The ALJ's depiction of the claimant's limitations must be "accurate, detailed, and

OPINION AND ORDER - 17

supported by the medical record." Tackett v. Apfel, 180 F.3d 1094, 1101 (9ᵗʰ Cir. 1999). If the

assumptions in the hypothetical are not supported by the record, a VE's opinion that a claimant

can work does not have evidentiary value. Gallant, 753 F.2d at 1456.

Here, the ALJ posed a vocational hypothetical describing an individual with Plaintiff's

age, education, and work experience, who was limited to light work that required only

occasional climbing, kneeling, crouching, crawling, and bilateral overhead reaching, and could

only work on even ground. Plaintiff contends that this hypothetical "omitted many of Plaintiff's

credible allegations describing his limited ability to sit, stand, and lift, carry, or manipulate

objects with his hands," and therefore elicited VE testimony that had no evidentiary value.

I disagree. The ALJ may have erred in failing to limit Plaintiff to occasional reaching in

all directions, because Dr. Berner, upon whom she relied,  had imposed this limitation.

Nevertheless, as discussed below, any error as to Plaintiff's reaching capacity was harmless. For

the reasons set out above, I conclude that the ALJ properly discounted Plaintiff's allegations of

other limitations greater than those set out in her RFC assessment.

The limitation to occasional overhead reaching set out in the ALJ's RFC would preclude

performance of all the duties of the blood donor unit assistant position, because that job requires

frequent reaching.  However, that limitation would not affect Plaintiff's ability to perform the

loss prevention surveillance monitor position, because that job does not require reaching. See

DOT 379.367-010, 1991 WL 673244.

Plaintiff contends that his inability to perform the blood donor unit assistant position is

significant because the surveillance system monitor position "when considered alone, may not

exist in significant numbers in the national or local economy." I disagree. The Commissioner

can satisfy his burden at step five by demonstrating that a claimant can perform a single

occupation.  See 20 C.F.R.  §§ 404.1566(b), 416.966(b).

Though there is no bright line test for determining what constitutes a "significant

number" of jobs,  Baker v. Secretary, 882 F.2d 1474, 1478 (9th Cir. 1989), the Ninth Circuit has

upheld the Commissioner's finding that 64,000 jobs in the national economy is sufficient to

satisfy the "significant number" requirement.  Moncada v. Chater, 60 F.3d 521, 524 (9th Cir.

1995).  Here, the VE testified that there are 1,240 surveillance monitor jobs in the local economy

and 142,000 surveillance monitor jobs in the national economy.  Therefore, even if Plaintiff

lacks the functional capacity required to perform the blood donor unit assistant position, the

Commissioner's decision denying Plaintiff's applications for benefits is affirmed.


### Conclusion

The decision of the Commissioner is AFFIRMED and this action is DISMISSED with

prejudice.

DATED this 9th day of August, 2012.


                                        /s/ John Jelderks
                                        John Jelderks
                                        U.S. Magistrate Judge


OPINION AND ORDER - 19